IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 5, 2018 Session

**IN RE JAYLAN W.**[1]

**Appeal from the Chancery Court for Williamson County
No. 1992A    Joseph A. Woodruff, Chancellor**

_____

**No. M2018-00628-COA-R3-PT**
_____

A father appeals the termination of his parental rights to his son on the grounds of abandonment by failure to visit and failure to support. Upon our review, we reverse the court's holding of abandonment by failure to visit; in all other respects, the judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed
in Part and Affirmed in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and BRANDON O. GIBSON, JJ., joined.

Raquel A. Abel, Franklin, Tennessee, for the appellant, John W.

Kathryn L. Yarbrough, Franklin, Tennessee, for the appellees, Robert and Kelly H.

**OPINION**

**I. FACTUAL AND PROCEDURAL HISTORY**

Mary G. ("Mother") gave birth to Jaylan in January 2013 while she was incarcerated. Before Jaylan was born, Mother had met Robert and Kelly H. ("Petitioners") through Jonah's Journey, an organization that facilitates the placement of the children of incarcerated parents with volunteers, rather than in the State's foster care system, until the parent's release. Mother executed a power of attorney allowing the Petitioners to take physical custody of Jaylan after his birth. Mother was released from

_____
[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

prison in March 2014 and moved in with the Petitioners at their home in Williamson County; she lived there for approximately a month, with the Petitioners helping her care for Jaylan, before she and Jaylan moved out of the Petitioners' home.

Jaylan's father is John W. ("Father"), whose paternity was established in May 2014 when the State sought child support from Father on Mother's behalf. Father was ordered to pay $50 per month for child support.

On April 4, 2015, Mother was involved in an automobile accident with Jaylan in the car. Mother was charged with Driving Under the Influence and Child Endangerment, which resulted in a violation of her parole and a return to the correctional system.[2] Mother called Kelly H. from the scene of the accident to take Jaylan. The Petitioners filed a "Petition for Dependency and Neglect" in the Juvenile Court of Williamson County, Tennessee on April 7. Father also filed a Petition for Dependency and Neglect, in which he stated "that he is capable and willing to take full custody of his son and that he can provide for him financially and emotionally."

After a preliminary hearing on the petitions, the court placed Jaylan in the temporary legal and physical custody of the Petitioners. An adjudicatory hearing was held on the petitions, and an order was entered on August 4, 2015, holding that, due to Mother's incarceration and Father's failure to support the child or establish a meaningful relationship, Jaylan was dependent and neglected as to both parents.[3] The order held that "due to [Father's] angry and disrespectful statements to the Court and those present at the time of the announcement of the Court's decision in this matter, the Court finds that visitation with Father is currently not in the child's best interests." The dispositional hearing was held on November 4, and the dispositional order entered on November 20, 2015, permitting Father to have weekly phone calls and up to two hours of unsupervised visitation with Jaylan on the third Saturday of each month. The order permitted Father to seek additional visitation provided that he completed an anger management program and specified that, prior to visitation taking place at his home, a home visit by a Court

---

[2] Mother later pled guilty to the charge of DUI, and the charge of child endangerment was dismissed.

[3] Hearings in dependent and neglect proceedings are conducted in accordance with Tenn. R. Juv. P. 27(b):

> Hearings in juvenile matters shall be conducted in two separate phases, the adjudicatory hearing, and the dispositional hearing, which may be continuous. The court shall first conduct an adjudicatory hearing to determine if the allegations of the petition are sustained. If the allegations of the petition are not sustained the petition shall be dismissed. If the allegations of the petition are sustained, the court may proceed immediately or at a later hearing to the dispositional phase of the proceeding. Pending disposition, the court may enter such order of protection and assistance as the court deems necessary under the circumstances, in the best interest of the child and for the protection of the public.

Appointed Special Advocate would need to be conducted and a report submitted to the court.

On behalf of Kelly H., the State filed a petition to set child support, and the court entered an order on January 29, 2016, setting child support at $267 per month each for Mother and Father, beginning February 1. On September 30, Father was held in contempt for failing to pay child support and sentenced to 30 days in jail, which the court stayed "provided Respondent pays as ordered"; a $1,667.55 judgment was entered against him for the arrearage. On October 28, Father was again held in contempt for failing to pay child support; a judgment of $1,718.52 was entered against him.

Petitioners filed the petition to terminate Father's parental rights in Williamson County Chancery Court on November 17, 2016, alleging that each parent had abandoned Jaylan and that termination of their rights was in Jaylan's best interest. With respect to Father, the petition alleged that Father had abandoned the child, as defined in Tennessee Code Annotated section 36-1-102(1)(A)(i) by willfully failing to maintain regular contact with Jaylan and willfully failing to pay the court-ordered child support in the four months prior to the filing of the petition. In due course, each parent was appointed an attorney, and each parent answered the petition.[4]

The Chancery Court record contains a handwritten letter from Father file-stamped December 19, 2016, that states that he is "trying to file a motion to dismiss this motion for adoption that the H[.]s are trying to file on me" and that he is "asking for a change of venue." Father also filed a Petition for Change of Custody on December 19, 2016, in the Juvenile Court proceeding. In it, Father stated that he "is employed full time, has family support, and is concerned of the child's well being" and that he felt "he can provide a safe and stable environment for Jaylan." A juvenile court magistrate held a hearing on

---

[4] In his Answer Father stated the following:

13. Father admits that he has been unable to exercise every visitation and phone call, as set forth in paragraph 13, but affirmatively asserts that there have been significant obstacles to his visitation with the minor child, including but not limited to employment schedules that conflicted with the limited court ordered visitation and transportation constraints. Father admits that he was unable to seek greater visitation with the minor child, before Petitioners filed the petition to terminate his parental rights, because of the obstacles he faced in obtaining the home studies and anger management class. However, Father affirmatively asserts that he did complete the requirements without assistance from any social service agency.

14. Father admits in part and denies in part the allegations set forth in paragraph 14. Father admits that child support was ordered to be paid by both Respondents and that he was found in contempt, and affirmatively asserts that he has paid $1,1116.48 in child support to Petitioners to date ($694.00 of which has been paid since he was found in contempt). Father also affirmatively asserts that he has paid more than $1,885.24 to Mother for support of the minor child.

Father's petition for change of custody on February 7, 2017. Father did not appear at the hearing, and the magistrate dismissed the petition on the basis of there being no material change in circumstances and due to the existence of the pending termination proceeding in Chancery Court.

A trial on the petition to terminate and for adoption was held on July 28 and August 14, 2017. The following witnesses testified: Mother; Debra D., Mother's mother; Karen W., foster parent of Mother's second child; Father; Katherine Sullivan, case manager for Williamson County Child Support Enforcement Services; Kelly H.; and Keirra F., the mother of three of Father's children.

The trial court entered an order on March 12, 2018, terminating both parents' rights to Jaylan on the ground of abandonment and upon a finding that termination was in Jaylan's best interest. Father appeals, raising the following issues for our review:

1. Whether there is clear and convincing evidence to support the termination of parental rights for abandonment for failure to support the child?
2. Whether there is clear and convincing evidence to support the termination of parental rights for abandonment for willful failure to visit the child?
3. Whether the Trial Court made the necessary findings of fact and conclusions of law necessary to support a termination of parental rights.
4. Whether the termination of parental rights was in the best interest of the child.

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and

4

convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).  In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004).  As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.*  We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights.  *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established."  *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## III. ANALYSIS

### A. Adequacy of the Trial Court's Findings and Conclusions

We first address the third issue Father raises: "Whether the Trial Court made the necessary findings of fact and conclusions of law necessary to support a termination of parental rights."  While the issue, as stated, appears to assert that the order failed to make the specific findings of fact and conclusions of law required by Tennessee Code Annotated section 36-1-113(k), upon our review, the order fully complies with the statute.[5]  From our review of Father's arguments relative to this issue and the way in which he has organized his brief, it is clear that he is challenging the sufficiency of the evidence to support the court's conclusions.  The order contains the necessary findings of fact and conclusions of law.

### B. Abandonment

Father's rights were terminated on the ground of abandonment by willful failure to visit and willful failure to support.  Abandonment is identified as a ground for termination in Tennessee Code Annotated section 36-1-116(g)(1); pertinent to this appeal, "abandonment" is defined at section 36-1-102(1)(A) as:

---

[5] In pertinent part, Tennessee Code Annotated section 36-1-113(k) requires that the court "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing."  The order terminating both parents' rights is 24 pages and is clearly of the court's own creation; it devotes five pages alone to its findings related to the grounds for termination of Father's rights.

For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A). In this case, because the petition for termination was filed on November 17, 2016, the pertinent time period was July 17 to November 16.

Father's argument relative to this ground causes us to examine the sufficiency of the evidence of willfulness, a requirement this Court explained in *In re Audrey S.*:

> . . . Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. . . .

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (internal citations omitted).[6]

---

[6] Petitioners bore the burden at trial of establishing by clear and convincing evidence that Father's failure to visit and support was willful. Tenn. Code Ann. § 35-1-113(c); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). As this Court recently noted in *In re Gabriel B.*:

6

## 1. Abandonment by Failure to Support

The petitioner has the burden of proving a parent's income and ability to pay when establishing willful failure to support. *In re Anna B.*, No. M2016-00694-COA-R3-PT, 2017 WL 436510, at *7 (Tenn. Ct. App. Feb. 1, 2017) (*no perm. app. filed*). This can be established through evidence showing the parent was able to support the child. *In re Noah B.B.*, E2014-01676-COA-R3-PT, 2015 WL 1186018 at *9 (Tenn. Ct. App. Mar. 12, 2015) (*no perm. app. filed*).

In this regard, the trial court found as follows:

> Father is 33 years of age. He has obtained a GED certificate. In addition to Jaylan, Father has thirteen other children by seven different women. At the time of trial, Father had lived in Clarksville, Tennessee for eight months. Father is employed full time by Trane Corporation earning an hourly wage of $14.14. He lives in a double-wide, three-bedroom mobile home for which he pays monthly rent of $575.
>
> ***
>
> On January 29, 2016, Father and Mother were each ordered to pay child support to Petitioners in the monthly amount of $267 beginning February 1, 2016. At no time prior to the filing of the Petition did Father make a single payment of child support in the full amount required. On October 28, 2016, Father appeared on the child support enforcement docket in the Juvenile Court of Williamson County responding to a Petition for contempt. Father waived his right to a hearing and admitted three violations. Specifically, Father admitted he "had the ability to pay child support on the date payments were due and willfully failed to pay as ordered" and was sentenced to confinement for ten days for each violation to run consecutively for an effective thirty-day sentence. The Juvenile

---

The statute defining "abandonment" was amended effective July 1, 2018, and as amended, Tenn. Code Ann. § 36-1-102(1)(A) no longer includes the term "willful" in its definition of "abandonment." Instead, Pub. Ch. 875, § 2, codified at Tenn. Code Ann. § 36-1-102(1)(I), makes the absence of willfulness an affirmative defense to abandonment for failure to visit or support. The parent (or guardian) will have to prove by a preponderance of the evidence that the failure to visit or support was not willful. Because this change is substantive rather than procedural or remedial, however, the amended statute will not be applied retroactively to this case. *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004).

No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *4 (Tenn. Ct. App. July 23, 2018).

Court stayed Father's sentence on the condition Father paid child support as ordered. A judgment of $1,667.55 was entered against Father for child support arrears as of September 30, 2016. Father was ordered to make payments of $50 per month toward the judgment beginning October 1, 2016. On November 1, 2016, an income withholding Order was entered and issued to Trane to effectuate a monthly wage assignment of $327 representing $267 for current support and $60 for past-due support. Similar income withholding Orders were issued to Trane for the months of December 2016 and January 2017.

On March 31, 2017, Father was again before the Juvenile Court child support docket to answer a Motion to impose his sentence. Father's case was continued to May 12, 2017, and he was expressly ordered to pay his child support personally if his employer failed to implement the wage assignment. On May 12, 2017, Father failed to appear in Juvenile Court. The Court issued an attachment and lifted the stay on Father's sentence of confinement for contempt.

Based upon the foregoing facts, including especially Father's admissions as documented in court Orders, the Court finds by clear and convincing evidence Father's failure to support Jaylan was willful. Petitioners have carried their burden to prove by clear and convincing evidence that grounds exist for terminating Father's parental rights.

(Footnotes omitted.)

With respect to this ground, Father does not dispute that he was aware of his duty to support or that he only paid $59.62 in support during the relevant time period; he argues that the evidence does not support a finding of willful failure to support because Petitioners failed to introduce evidence of his income and expenses during the relevant time period. He argues that "internal errors" in the Child Support Office "caused repeated cancellations of wage assignments" and "were a significant interference with [his] efforts to support [Jaylan]."

As noted earlier, Father's child support for Jaylan had been set at $267 per month by order entered January 26, 2016. Kelly H. testified that, during the period of July 17 to November 16, Father made one support payment of $59.62 in October; she also testified that Father did not provide Jaylan with any clothing, food, or other necessities during this period.

Father testified that he has worked at Trane Company in Clarksville since July 28, 2016, and worked 40 hours a week, plus overtime, that his initial pay rate was $9.25 per hour and that he had recently received an increase to $14.14 per hour.

8

Much of Father's testimony as to his expenses was conflicting and contradictory. As to his living expenses, he testified that he stayed with his aunt for four or five months, starting "around July 20, 2016" and that he was currently living in a three-bedroom mobile home, which he had been renting for the past eight months, and that his rent was $575 per month.[7] Petitioners attempted to question him about his support of his other children, but as was the case with much of Father's testimony, he did not give specific, clear answers.[8] He testified that he receives no government assistance and that when his children need something, he "always will go half on it." When pressed by Petitioners' counsel for an amount that he expends on his children, Father testified that he "just really can't just say . . . [b]ut I send money on a regular basis." In light of Father's testimony that he was gainfully employed during all but the first two weeks of the pertinent four-month period, that he lived in his aunt's home during that time, that his paycheck was enough to cover his children's expenses, and that his children "all have got clothes and shoes, and they're not really wanting for anything," we conclude that Father had the ability to pay support.

Father challenges the trial court's reliance on the October 2016 order of the child support magistrate in which Father admitted that he had the ability to pay child support, arguing that the trial court should not rely "upon a form order, signed by a parent with less than a high school education and without the benefit of counsel." We are unpersuaded by this argument. Other evidence in the record shows that Father was employed during the pertinent period and, as noted above, that he had the ability to pay support. Various orders relating to child support contained in the record of the juvenile court proceedings show that Father was represented by counsel in some of the proceedings and not in others. There is nothing in the record to show, and Father does not set forth a cogent argument to support, the contention that Father was unaware of his responsibility or was disadvantaged by signing the order acknowledging his ability to pay support.

Father argues that what he asserts are internal errors of the Child Support Office substantially interfered with his efforts to pay support. Katherine Sullivan, the child support enforcement officer, testified the wage garnishments were being correctly set up but "closed out" due to an error in another county's child support office.

Father testified that he checked his payment records online after starting work at Trane, and saw that "it said child support garnishment[, . . . so I] thought it was coming

---

[7] He testified that he moved from Jackson, Tennessee, to Clarksville on July 16.

[8] For example, he testified that he was living in Gallatin, working at Nissan when he met Mother but later testified that they were introduced by a friend in West Tennessee. He testified that he had no child support orders relative to his other children, but that his "DNA was in the database already . . . because of his other children" and that he owes $6,500 in child support arrearages. He testified that he started working at Trane in July 2016, and later testified that he "didn't come with Trane until December."

out, but it was coming out for my son I have custody of right now. . .When I seen [sic] garnishment, I thought it was all of them – both of these cases, but it wasn't, come to find out." Contrary to Father's testimony, Ms. Sullivan testified as follows:

Q. Now, according to your phone records, in August of -- August 31st, 2016, [Father] contacted you; correct?
A. Yes.
Q. And you told him that a wage assignment was in place?
A. Yes, but no monies have come in yet.
Q. Okay. And in September 23rd, 2016, he called you?
A. Yes.
Q. And he -- what was he asking you there?
A. "Received a phone call. He wanted to know if we received the payments. Told him that we are not and that he needs to send them in."
***
Q. But you also told him there was a wage assignment in place; correct?
A. [Witness referred to her notes] received a phone call from him and told him that we -- he wanted to know if we were receiving payments. I told him that we are not and that he needs to send them in.

Father concedes in his brief that "the Williamson County Child Support Office's internal errors did not prevent Father from paying child support as ordered, [but] the Child Support Office's inability to recognize and fix the internal errors that caused the repeated cancellations of wage assignments were a significant interference with Father's efforts to support his son." We are not persuaded that the delay in the wage assignments becoming effective constituted a substantial interference with Father's attempts to support his child or is evidence that his failure to pay support was not willful. Father was informed in August and September that his child support for Jaylan was not being withheld from his paycheck and that he needed to pay support; notwithstanding this knowledge, he failed to pay the support directly.

The record contains clear and convincing evidence that Father was aware of his duty to support Jaylan, had the capacity to pay support, and had no justifiable excuse for his failure to pay support. We affirm the trial court's holding that termination of Father's rights was warranted on this ground.

### 2. Abandonment by Failure to Visit

Father was allowed unsupervised visitation with Jaylan for up to two hours the third Saturday of each month and telephone visitation each Saturday. The evidence admitted at trial, including the testimony of Father and Kelly H., as well as a calendar for the year 2016, established that during the pertinent four-month period, there were three third Saturdays on which Father could have visited; Father visited on one of those

10

Saturdays for 45 minutes. During the same period of time, Father called Jaylan 10 times. Thus, Father exercised visitation in 11 of the 17 weeks in the four-month period.

Failure to visit is "willful" when a person is aware of the duty to visit, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. The proof establishes that, during the four-month period, Father was aware of his duty to visit Jaylan, attempted to arrange rides to visit Jaylan, and had ten telephone calls and an in-person visit with him. In light of the telephonic visitation Father exercised, as well as the challenges that Father had to visiting Jaylan in person, the visitation he exercised is more than token.[9] Given our standard of review, the evidence does not clearly and convincingly lead us to conclude that Father willfully failed to visit Jaylan; accordingly, we reverse this ground of termination of Father's rights.

### E. Best Interest

We next review the court's conclusion that termination of Father's parental rights is in the best interest of Jaylan, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i)[10] for courts to follow in determining a

---

[9] Tennessee Code Annotated section 36-1-102(1)(E) states that "'willfully failed to visit' means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation"; section 36-1-102(1)(C) defines "token visitation" to "mean[] that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child."

[10] Section 36-1-113(i) provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or

child's best interest. The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

The trial court made findings with respect to statutory factors (1), (3), (4), (5), (6), (7), (8), and (9):

> Father has undergone a vasectomy procedure since the birth of his fourteenth child. This is a laudable change in Father's circumstances. He lives in a double-wide mobile home which he rents. He is employed full time. Father testified he intended to pursue restoration of his driving privileges; however the record contains no evidence whether those efforts have been successful. Also, Father has made no adjustment in his visitation with Jaylan. Between the filing of the present Petition and the trial, Father only visited Jaylan once, on January 21, 2017.
>
> ***
>
> Father does not financially support any of his fourteen children to any reasonable degree. Petitioners have voluntarily undertaken to raise Father's son, Jaylan, and to provide for his physical, medical, and, emotional needs. Father responded to Petitioners with an inappropriate display of hostility. . . . Father also criticized Petitioners for having sought medical care for Jaylan, who was diagnosed with attention deficit disorder. Father referred to Petitioners as "drugging" Jaylan. Father's neglect of his child support obligations has entangled him in the justice system including a conviction for contempt. That has not resulted in any adjustment by Father in the performance of his financial support responsibilities.

---

neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Neither Father nor Mother have maintained regular visitation or contact with Jaylan. Father's last contact visit with Jaylan was January 21, 2017. His last telephone visit was February 25, 2017. No meaningful relationship has been established between Jaylan and Mother. The same cannot be said of Jaylan's relationship with Father. The evidence shows Jaylan knows who Father is and he interacts with him in an age-appropriate manner during telephone calls. On the other hand, Father's relationship with Jaylan cannot favorably compare in any way with the relationship Jaylan has with Petitioners.

Jaylan has been in Petitioners' custody for 80% of his life. He was only in Mother's custody for less than twelve months, and Jaylan has never been in Father's sole, unsupervised custody. The only stable home environment Jaylan has ever known is Petitioners'. Mr. and Mrs. H[.] provide Jaylan with medical care for a diagnosed condition which Father denies Jaylan has. He even criticizes Petitioners for having Jaylan treated. Changing Jaylan's caretakers and physical environment would have a profound detrimental impact on Jaylan's emotional, psychological, and medical condition.

Both Mother and Father have been previously adjudicated to having neglected Jaylan. Mother has exposed Jaylan to risk of physical injury. Otherwise, the evidence does not support a conclusion that parents have committed any acts of brutality, sexual, psychological, or emotional abuse of Jaylan.

***

Father's physical environment is much better than Mother's. Father rents a double-wide mobile home in Clarksville, Tennessee. Father has a history of frequent relocations associated with job changes. He also has a history of misdemeanor offenses, and Father does not have a license to drive a motor vehicle. Father's ability to care for Jaylan in a safe and stable manner is adversely impacted by the fact he cannot lawfully drive.

. . . Father certainly does not present the same host of mental and emotional issues as Mother. Nevertheless, Father has a history of anger management issues and does not appear to consider Jaylan's diagnosed attention deficit disorder as a legitimate problem.

Neither Mother nor Father has paid child support consistent with the Child Support Guidelines promulgated by the Department pursuant to T.C.A. § 36-5-101.

13

Jaylan, who turned five years old on January 15, 2018, has lived all but 12 months of his entire life in the home provided to him by Mr. and Mrs. H[.]. Petitioners are not strangers to Jaylan. They are the people Mother chose to care for Jaylan months before he was born in prison. They are the people Mother called and to whom she again entrusted Jaylan when she drove intoxicated and wrecked her car with Jaylan riding as a passenger. Petitioners have devoted considerable energy and treasure into Jaylan's care and nurture. They have actively facilitated efforts to foster a relationship between Jaylan and his maternal half-siblings by taking Jaylan to Jackson, Tennessee for contact visits with Nathan, and welcoming Nathan to reciprocal visits in their home. Mrs. H[.] testified credibly she and her husband believe it is in Jaylan's best interests to have a relationship with his half-siblings. She also credibly professed a willingness to foster a relationship between Jaylan and his biological parents so long as the surrounding circumstances were safe for Jaylan.

Jaylan has not formed a meaningful attachment or relationship with Father. . . . Changing Jaylan's caregivers from Petitioners to either Mother or Father would have a detrimental effect on Jaylan's emotional, medical, and psychological condition and wellbeing. Since April 4, 2015, when Mother placed Jaylan in Petitioners' custody at the scene of her car accident, Jaylan has been well cared for and appropriately nurtured. His medical needs have been identified and treated. He has formed strong attachments to Petitioners. His environment has been stable, healthy and free from exposure to criminal activity, alcohol abuse, and use of illegal drugs.

. . . Father completed an anger management class on February 2, 2017. Father has also adjusted his lifestyle by having a vasectomy. This ensures he will not face the prospect of increased support obligations beyond his existing duty to support his fourteen children. Nevertheless, Father has abandoned Jaylan by willfully failing to visit him and to pay child support.

From all of the foregoing, the Court concludes that termination of Mother's and Father's parental rights is clearly and convincingly in Jaylan's best interests.

Father does not argue that the evidence preponderates against the court's findings or suggest that there was evidence overlooked by the court. Upon our review, we conclude that the factual findings are supported by clear and convincing evidence.[11]

---

[11] Father argues that the trial court "suggested that Father had a history of anger management issues" and

Father asserts that the evidence should have led the court to conclude that termination was not in Jaylan's best interest because Father has made an adjustment of circumstances, maintained regular contact with Jaylan such that a meaningful relationship was fostered between them, and established a home that is healthy and safe. Father also argues that the evidence does not support a conclusion that changing Jaylan's caretakers and physical environment will have a negative effect on Jaylan.

We have carefully considered the record in this case, which shows that Jaylan was placed with the Petitioners when he was three days old; at the time of trial, he was four and a half years old. He calls the Petitioners "Mom" and "Dad" and is well integrated into their stable, loving family. Kelly H. testified that she would like to adopt Jaylan and is financially, emotionally, and physically capable of providing Jaylan with the care and support that he needs. A home study entered into evidence at trial supports her testimony on this point.[12] While in the care of the Petitioners, Jaylan has been able to attend soccer camp, swim lessons, and be involved in the neighborhood and church of the Petitioners. Jaylan attends a preschool program. Kelly H. testified that Jaylan has been diagnosed with ADHD and "possibly some reactive attachment disorder." She testified that Jaylan is currently prescribed medication for the ADHD and that she and Jaylan participate in parent-child interactive therapy. Kelly H. testified that she is fearful of Jaylan being in

---

that this was without factual foundation. The court's holding, taken in context, states that "Father certainly does not present the same host of mental and emotional issues as Mother. Nevertheless, Father has a history of anger management issues and does not appear to consider Jaylan's diagnosed attention deficit disorder as a legitimate problem." As noted by Father in his brief, the evidence pertinent to this holding was an incident at one of the juvenile court hearings in which Father became upset at some allegations made by Petitioners and rulings by the court, including the placement of Jaylan with Petitioners; as a result of his outburst, in establishing Father's visitation, the juvenile court held that "due to [Father's] angry and disrespectful statements to the court . . . visitation with Father is currently not in [Jaylan's] best interest." In our analysis we have taken into account the trial court's statement, which was made in the context of its discussion of both parents' mental or emotional status, together with clarity of the circumstances giving rise to the statement; in so doing, we do not give this statement the weight Father does and, in our review, do not consider it as evidence of any mental or emotional disability on the part of Father. We agree that the record before us does not contain clear and convincing evidence that Father's mental or emotional status would be detrimental to the child, as contemplated by Tennessee Code Annotated section 36-1-113(i).

[12] The testimony of Karen Wise, foster parent of another child of Mother's, also attests to the positive environment in which Jaylan currently resides:

Q. Do you believe that the H[.]s are a stable family?
A. Absolutely.
Q. And have you been able to observe them with their other children?
A. Yes.
Q. Do you believe that the H[.]s are financially capable of taking care of Jaylan?
A. Yes.

the complete care of Father, as Father "has not been a 24/7 parent, aside from all of the mothers [of his other children] helping."

As we consider Father's argument, we are mindful that in this phase of our analysis, "[t]he child's best interests must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). "[W]hen the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-101(d)). While there are factors that weigh in favor of and against a holding that termination of Father's rights is in Jaylan's best interest, the trial court and this court must view the determination from the child's perspective and resolve conflicts in the child's favor. Jaylan is thriving in his current environment, and the record is clear and convincing that a change in caretakers would be detrimental to this young child. Despite Father's arguments to the contrary, which we have carefully considered, the evidence clearly and convincingly leads us to the conclusion that termination of Father's rights is in Jaylan's best interest.

## IV. CONCLUSION

In light of the foregoing analysis, we reverse the trial court's determination that Father willfully abandoned Jaylan by failing to visit him. We affirm the court's holding that termination was warranted on the ground of Father's failure to support and upon its determination that it is in the best interest of Jaylan that Father's rights be terminated.

_____
RICHARD H. DINKINS, JUDGE